**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:06cv316**

| | | |
|---|---|---|
| **VONCILLE O. STUKES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **O R D E R** |
| | ) | |
| **MICHAEL CHERTOFF, Secretary,** | ) | |
| **United States Department of** | ) | |
| **Homeland Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for

Summary Judgment [Doc. 38]; the Defendant's Motion for Summary

Judgment [Doc. 39]; and the Plaintiff's Motion to Strike "Argument[s]" from

Plaintiff's Motion for Summary Judgment [Doc. 44].

**I.     PROCEDURAL HISTORY**

On August 2, 2006, the Plaintiff, proceeding *pro se*, initiated this

action against the Defendants Michael Chertoff, Secretary of the United

States Department of Homeland Security ("DHS"); Richard H. Gottlieb,

DHS Officer-in-Charge; Judy T. Ferguson, DHS Supervisor Immigration Officer; and Rosemary L. Melville, DHS District Director of Immigration (collectively "Defendants"), alleging that the Defendants had terminated her employment as an Immigration Status Verifier based on her race and disability and in retaliation for complaining about discrimination. [Doc. 1]. On September 5, 2006, the Defendants filed a motion seeking to dismiss the Plaintiff's claims for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction. [Doc. 6]. The Plaintiff failed to respond to the Defendants' motion. The Magistrate Judge entered a Memorandum and Recommendation on October 2, 2006, recommending that the Defendants' motion to dismiss be granted and that the Plaintiff's Complaint be dismissed in its entirety. [Doc. 9]. The Plaintiff filed timely objections to the Magistrate Judge's Recommendation. [Doc. 10].

While the Magistrate Judge's Memorandum and Recommendation was pending with respect to the Plaintiff's claim that she was wrongfully terminated, another administrative appeals process was ongoing with respect to claims of discrimination and harassment that the Plaintiff had alleged regarding to certain actions taken against her prior to her termination. In July 2007, this second administrative process came to a

close with the EEOC's denial of her appeal of DHS's Final Decision on these claims. Upon receiving the EEOC's decision, the Plaintiff, without seeking leave of Court, filed an "Amended Complaint" in this litigation to add these discrimination and harassment claims to her present civil action. [Doc. 12]. The Defendants immediately moved to dismiss, arguing that the Amended Complaint reasserted claims presented in the original Complaint which were the subject of the Defendants' pending motion to dismiss. [Doc. 14].

On September 27, 2007, this case was reassigned to the undersigned.

On October 29, 2007, the Court entered an Order accepting the Magistrate Judge's Memorandum and Recommendation and thereby granting the Defendants' Motion to Dismiss the Plaintiff's original Complaint. [Doc. 23 at 11]. The Court also granted the Defendants' Motion to Dismiss the Plaintiff's Amended Complaint with respect to the Plaintiff's claim under 42 U.S.C. §1981 and the Plaintiff's claims against Richard H. Gottlieb, Judy T. Ferguson, and Rosemary L. Melville, individually. [Id. at 26-27]. The Court, however, concluded that the other claims asserted in the Amended Complaint had not been asserted

previously and therefore the dismissal of her EEO complaint asserting these claims based on such prior filing had been in error.  Accordingly, the Court denied the Defendants' Motion to Dismiss the Amended Complaint with respect to the Plaintiff's claims of demotion (arising from her two-day and fourteen-day suspensions without pay); her claim of general harassment (described as "a pattern of continuous harassment"); and her claims of "undesirable reassignment, work assignments, threats, intimidation, reprisal, disability, hostile work environment, unjustified negative evaluation, [and] significant change in employment status."  [Doc. 23 at 22-23].  The Court directed the parties to proceed with an Initial Attorneys' Conference (IAC) and to file the appropriate certification thereafter with the Court.  [Doc. 23 at 25].

The parties complied with the Order and conducted an IAC, although the parties submitted competing Certificates of Initial Attorney's Conference.  [Docs. 25 and 33].  Following the filing of the Certificates of IAC, Magistrate Judge Horn entered a Pretrial Order and Case Management Plan [Doc. 27], setting various deadlines in this case.  The deadline for the completion of discovery was set for July 7, 2008.  [Id.].

On November 14, 2007, the same day that the Pretrial Order and Case Management Plan was entered, the Plaintiff filed a Motion for Summary Judgment, accompanied with over 700 pages of exhibits, arguing that the Court should "issue a Summary Judgment in her favor." [Doc. 29 at 7]. Finding the Plaintiff's Motion for Summary Judgment to be "extremely premature," the Court denied the Plaintiff's Motion without prejudice with leave to re-file the same upon the conclusion of discovery. [Doc. 37].

On July 8, 2008, both parties filed their respective motions for summary judgment. [Docs. 38, 39]. On July 14, 2008, the Plaintiff filed a Motion to Strike "Argument[s]" from Plaintiff's Motion for Summary Judgment [Doc. 44], which the Defendant does not oppose [Doc. 48]. On July 16, 2008, Magistrate Judge Horn issued an Order in accordance with Roseboro v. Garrison, 528 F.3d 309 (4th Cir. 1975), advising the Plaintiff of the "heavy burden" she carries in responding to the Defendant's Motion for Summary Judgment. Specifically, Judge Horn cautioned: "if the Plaintiff has any evidence to offer to show that there is a genuine issue for trial, she must now present it to this Court in a form which would otherwise be

admissible at trial, i.e., in the form of affidavits or unsworn declarations."

[Doc. 45 at 2].[1]

The parties filed their respective responses to the pending summary

judgment motions on July 18, 2008. [Docs. 47, 48]. Additionally, the

Defendant filed a reply brief on July 25, 2008. [Doc. 49]. The Court finds

that this matter is now ripe for disposition.


## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). "As the Supreme

Court has observed, 'this standard provides that the mere existence of

*some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact.'" Bouchat v.

---

[1]This warning apparently went unheeded, as many of the exhibits filed by the Plaintiff are not in admissible form. To the extent that the Plaintiff has submitted affidavits and other admissible evidence, the Court will consider such evidence in evaluating the parties' summary judgment motions. Unsworn allegations, hearsay, and other inadmissible documents, however, will be disregarded.

Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d (1986)) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), cert. denied, 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. Id.

> A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. Furthermore, neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

Id. (internal citations and quotation marks omitted). Nonetheless, in considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574,587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where, as here, the parties have filed cross-motions for summary judgment, the Court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## III.    FACTUAL BACKGROUND

The forecast of evidence, taken in the light most favorable to the Plaintiff, shows the following. The Plaintiff began her employment as a Status Verifier for the U.S. Department of Justice, Immigration and Naturalization Service ("INS"), on November 8, 1998. A Status Verifier processes G-845 forms, which are requests by federal and state agencies and educational institutions to verify the legal status of aliens and new

citizens. [Affidavit of Judy Ferguson ("Ferguson Aff."), Doc. 41-2 at ¶2]. The functions of the INS were transferred to the newly created Department of Homeland Security, Citizenship and Immigration Services ("CIS"), effective March 1, 2003. [Affidavit of Richard H. Gottlieb ("Gottlieb Aff."), Doc. 41-3 at ¶2].

Until the Plaintiff was terminated from her employment on March 17, 2005, the Plaintiff's direct supervisor was Supervisory Immigration Information Officer Judy Ferguson ("Ferguson"), her second level supervisor was Supervisory District Adjudications Officer Richard Kalb ("Kalb"), and her third line supervisor was Richard Gottlieb ("Gottlieb"), the Officer in Charge of the Charlotte CIS Office. [Id. at ¶3].

## A. Suspensions

On January 28, 2004, Gottlieb sent a memo with supporting documents to District Director Rosemary Melville ("Melville"), wherein he requested that she consider disciplinary action against the Plaintiff. This request was based upon the fact that beginning in September 2003 and continuing into January 2004, the Plaintiff had objected to and refused to comply with certain assignments from her direct supervisor, Ferguson, and had communicated with Ferguson in a disrespectful manner, including the

use of profanity and shouting.  [Gottlieb Aff., Doc. 41-3 at ¶4, Ex. 2-A; Ferguson Aff., Doc. 41-2 at ¶5].

In response to Gottlieb's memo, on February 1, 2004, the Plaintiff contacted an EEO Counselor to file an informal complaint of discrimination. On March 11, 2004 she filed a formal EEO Complaint.  [Complaint of Discrimination, Doc. 12-3 at 19].  The first knowledge that Gottlieb had of the Plaintiff's EEO filing was on February 18, 2004, when an EEO Counselor informed him of that fact.  [Gottlieb Aff., Doc. 41-3 at ¶5, Ex. 2-B].

At approximately 2:00 p.m. on February 18, 2004, the Plaintiff went into Ferguson's office, threw a leave request slip on her book case and left the office.  This leave slip requested sick leave for *July* 18, 19 and 20, 2004.  The Plaintiff did not return until 1:30 p.m. on February 20, 2004. She did not obtain advance leave for this time off, nor did she call in to report to her supervisor on February 19 or 20, 2004 that she would not be at work for all or part of those days, despite the fact that the Plaintiff had been warned just a month earlier that she needed to obtain advance approval when possible before taking sick leave.  [Ferguson Aff., Doc. 41-2 at ¶6].

Gottlieb believed that the Plaintiff's had not made a proper request for sick leave, and he knew that the Plaintiff had been warned the month before that she needed to obtain advance approval for sick leave when possible. It appeared to him that the Plaintiff was mad at her supervisor and simply decided to walk off the job for three days which she expected to be awarded sick leave. Accordingly, Gottlieb directed that the Plaintiff be charged 15.5 hours of being absent without leave (AWOL). [Gottlieb Aff., Doc. 41-3 at ¶7].

On February 24, 2004, Gottlieb sent another memo to Melville regarding the AWOL incident, as well as other instances of misconduct by the Plaintiff, including disrupting a conversation between a co-employee and an attorney and challenging a supervisor with respect to work assignments. [Id. at ¶ 8, Ex. 2-D]. Melville forwarded Gottlieb's memos to David Huff, a Human Resources Specialist in the DHS/CIS Office of Labor and Employee Relations, with a request that his office review the matter. [Affidavit of Rosemary Langley Melville ("Melville Aff."), Doc. 41-6 at ¶3]. Huff reviewed the matter with Gottlieb by telephone and prepared for his signature a letter proposing a two-day suspension. [Affidavit of David L. Huff ("Huff Aff."), Doc. 41-7 at ¶3].

On March 23, 2004, Gottlieb advised the Plaintiff that he was proposing a two-day suspension for these instances of misconduct and her unauthorized absence. The letter specifically advised the Plaintiff that the final disciplinary decision would be made by Melville. [Gottlieb Aff., Doc. 41-3 at ¶9]. In response, the Plaintiff submitted a ten-page response wherein she admitted putting the wrong dates on her leave slip and not having it signed before she left, but she blamed her immediate supervisor for not signing it anyway. [Doc. 41-8 at 7-8]. She further admitted throwing open a coworker's door when that person was on the telephone with an attorney, but attempted to excuse the disruption because it lasted only a few seconds. [Id. at 8].

On April 6, 2004, Ferguson went to the Plaintiff's office and asked her about Willene Jenkins, a co-worker who earlier in the week had to be taken to the hospital. The Plaintiff responded to Ferguson in a harsh tone, telling her that she needed to ask someone else. As Ferguson turned to leave the Plaintiff's office, the Plaintiff began to say something under her breath. When Ferguson asked her to repeat what she had said, the Plaintiff did not answer her and left her office. Ferguson could not locate her for another 45 minutes. [Ferguson Aff., Doc. 41-2, Ex. 1-C].

The next day, Ferguson approached the Plaintiff to discuss the events of the day before.  The Plaintiff became violent and began screaming and making intimidating threats.  The Plaintiff accused Ferguson of causing Jenkins to have an aneurysm and further accused her of causing the Plaintiff to have migraines.  The Plaintiff used hostile and abusive language and pointed her finger in Ferguson's face.  The Plaintiff called Ferguson a liar, saying that Ferguson that was making up stories about her.  The Plaintiff then stated that she was not going to take any further harassment and that she was going to call a security guard and call 911.  This incident was witnessed by Gottlieb and Marla Miller.  [Id.].  When Gottlieb tried to approach the Plaintiff, she went into her office, called 911 and summoned the police to the CIS office.  [Gottlieb Aff., Doc. 41-3 at ¶10].  The 911 call set off an alert warning on all the supervisors' telephones.  [Id.].  Later in the day, Gottlieb hand-delivered to the Plaintiff a letter from Melville which placed the Plaintiff on paid administrative leave as a result of her threatening behavior that day toward her supervisor.  The Plaintiff remained on paid leave until she was recalled to work on April 16, 2004.  [Id. at ¶11].

On April 21, 2004, Melville sent a letter to the Plaintiff advising her that she was imposing a 2-day suspension, effective April 22, 2004, arising from Plaintiff's misconduct in February, 2004. [Melville Aff., Doc. 41-6 at ¶4, Ex. 4-B]. The letter stated that Melville had not received any response from the Plaintiff and that the suspension was imposed without considering any response. After issuing that letter, Melville came across Plaintiff's written response. Accordingly, she sent another letter, dated April 27, 2004, advising the Plaintiff that she had reviewed the Plaintiff's written response and was sustaining the two-day suspension. [Id. at ¶4, Ex. 4-C].

On May 3, 2004, Mr. Gottlieb delivered to the Plaintiff a letter which stated that he was proposing a 14-day suspension for her conduct on April 6 and 7, 2004. As with the earlier suspension notice, this letter advised the Plaintiff of her right to respond to the proposed action and indicated that the final decision on the suspension would be made by Melville. [Gottlieb Aff., Doc. 41-3 at ¶13, Ex. 2-J].

On May 5, 2004, Melville met for nearly two hours with the Plaintiff to hear her response to the proposed 14-day suspension. During this meeting, the Plaintiff presented a written statement and also spoke at length in response to the proposed action. [Melville Aff., Doc. 41-6 at ¶6].

Melville found the Plaintiff to be "very confrontational" in this meeting, and she concluded that the Plaintiff "truly did not understand that the things she says and does are wrong." Melville further noted that the Plaintiff's version of one incident was exactly as it was reported by Ferguson in terms of the Plaintiff's tone and the anger in her way of speaking. [Id. at ¶7]. Subsequently, the Plaintiff was suspended for 14 days, effective July 11, 2004, and was ordered to seek EAP assistance for anger management. [Id. at ¶9, Ex. 4-G].

## B.     Reassignment of Duties

Until November 2003, Patricia Chambers ("Chambers"), a Records Technician, was assigned full-time to perform duties associated with the voluminous mail received and processed by the Charlotte CIS office. Mail processing duties included applying postage, as well as opening the mail and making a variety of substantive computer entries with regard to the documents contained therein and routing time sensitive mail to various offices. [Gottlieb Aff., Doc. 41-3 at ¶15]. At the time that Chambers left her employment with CIS in November 2003, CIS was under a hiring freeze and was not permitted to hire a replacement for her. Accordingly, the mail processing duties were divided up among numerous employees in

the office, including supervisors.  The Plaintiff was assigned only a part of the original mail processing duties previously performed by Chambers. Other employees, both African-American and Caucasian, and employees of whom there was no record or knowledge by supervisors of an alleged disability or prior EEO activity, also performed mail duties in addition to their other regular duties.  [Ferguson Aff., Doc. 41-2 at ¶9].

On several occasions during 2003, the Charlotte CIS office sent batches of G-845 status verification requests to the National Records Center ("NRC") to be processed. This was done to lighten the load on the Plaintiff as well as to provide work for employees at the NRC who had spare time.  [Id. at ¶10].  After being advised in March 2004 that the NRC would take all of Charlotte's status verification work on a temporary basis, the Charlotte CIS Office began sending that work to the NRC.  [Id. at ¶11]. In April 2004, Gottlieb decided that an employee needed to be physically in the mail room to handle duties that were best performed in that area.  He chose the Plaintiff because her status verification duties had been transferred to the NRC, and because the Plaintiff had expressed a desire to move her office.  Other employees continued to assist with mail processing duties.  [Gottlieb Aff., Doc. 41-3 at ¶18]. The Plaintiff moved to

the mail room on April 30, 2004. Ferguson observed that the Plaintiff appeared happy to be moving out of her old office. [Ferguson Aff., Doc. 41-2 at ¶12].

After the Plaintiff moved into the mail room, Gottlieb made several requests for additional staffing to help with the mail duties, but these requests were not granted. [Gottlieb Aff., Doc. 41-3 at ¶¶20-22]. It was not until early 2005, after the Plaintiff's termination, that Gottlieb's request for additional staffing was granted. At that time, the Charlotte office was permitted to hire two Status Verifiers. Sheila Keller, who is Caucasian, and Anita Dunham, who is African-American, were both hired as Status Verifiers effective October 2, 2005. Neither Keller nor Dunham, however, performed status verification duties at that time because those duties were still being handled remotely at the NRC. Instead, both performed the mail processing duties previously performed by the Plaintiff. Keller left that position after only five months in March 2006 and was replaced by a African-American employee. Dunham began doing the work of a Status Verifier in February 2007. Ultimately, all status verification duties were reassigned to a central office in Washington, D.C. in September 2007. [Gottlieb Aff., Doc. 41-3 at ¶23].

## C. Performance Review

Prior to May 13, 2004, Ms. Ferguson prepared an annual review form for the Plaintiff for the 2003-2004 rating year which included comments on Element #5 as follows: "Not rated during this period. Standards not met during performance period in the area.  Subject to pending disciplinary action under review by the District Director."  [Ferguson Aff., Doc. 41-2 at ¶14].  Before giving this review to the Plaintiff, Ferguson became aware that agency policy required that disciplinary matters not be mentioned in annual reviews and that the review form should be completed without reference to such matters. Accordingly, Ms. Ferguson typed a new page for Element # 5 which did not include these comments and merely stated "Ms. Stukes makes effective use of time away from desk, personal telephone calls and social conversations."  The rating for this category was "Fully Successful."  [Id.].

On or about May 18, 2004, Ferguson gave the Plaintiff her annual review form for the 2003-2004 rating period. By mistake, Ferguson failed to delete the page that referred to disciplinary action.  When Ferguson realized the error, she informed the Plaintiff that the page regarding disciplinary action was in error and was not part of the performance review.

[Id. at ¶15].  The Plaintiff's official performance review for 2003-2004 does not contain the page with the comment regarding disciplinary action.  [Id.].  The Plaintiff admits that Ferguson returned to replace pages in the review. [Plaintiff's Aff., Doc. 41-10 at 17].

### D.  Other Facts Related to Alleged Disparate Treatment and Hostile Working Environment

The Plaintiff asserts a litany of ways in which she was subjected to disparate treatment and a hostile working environment.  She claims that her time and attendance were unduly scrutinized and that her leave requests were unreasonably denied, [Plaintiff's Aff., Doc. 41-10 at 5]; that she was assigned extra duties for which she received no compensation or recognition, [Plaintiff's Aff., Doc. 29-4 at 24]; that she did not receive any special recognition for her contributions during the office move, while four Caucasian employees received incentive awards based upon their efforts, [Plaintiff's Aff., Doc. 41-10 at 6]; that she was the only employee with a windowless office, [Plaintiff's Aff., Doc. 29-4 at 24]; that she was told to keep her office door and blinds open, [Plaintiff's Aff., Doc. 29-4 at 24]; that other Caucasian employees who engaged in misconduct did not receive discipline as severe as she received, [Plaintiff's Aff., Doc. 41-10 at 4]; and that her Caucasian co-workers have been involved in verbal confrontations

with Ferguson but have never been charged with being disrespectful or insubordinate, nor does Ferguson "pretend to be fearful of them," [Plaintiff's Aff., Doc. 41-10 at 3].

## IV.    DISCUSSION

A plaintiff asserting a claim of unlawful employment discrimination may establish her claim in one of two ways.  First, a plaintiff may present "direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor . . . motivated the employer's adverse employment decision."  See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005).  Alternatively, the plaintiff may present evidence giving rise to an inference of unlawful discrimination under the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v.  Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Diamond, 416 F.3d at 318.  Once the Plaintiff has made out a prima facie case, the burden of production shifts to the Defendant "to articulate a legitimate, non-discriminatory reason for the adverse employment action."  Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004).  If the Defendant satisfies this burden,

the Plaintiff must then "prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).  "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."  Reeves, 530 U.S. at 153, 120 S.Ct. 2097.

## A.    Disability Discrimination Claim

The Plaintiff alleges that she has "a rated 10% service connected disability for migraine headaches."  [Doc. 12-2 at 4].[2]  Specifically, she claims: "I feel I was discriminated against on the basis of my disability because due to constant stress of trying to resolve issues with Ms. Ferguson and not having any support from other supervisory officials I feel they directly affected my having frequent migraine headaches."  [Doc. 12-3 at 20].

Since the employment at issue was with the Federal Government, the Plaintiff's disability discrimination claim arises under the Rehabilitation Act, see 29 U.S.C. §794(a), rather than the Americans with Disabilities Act,

---

[2]In her original Complaint, the Plaintiff alleged disability based upon back pain. [Doc. 1 at 3].

42 U.S.C. §12101, et seq. ("ADA").   The Rehabilitation Act prohibits

discrimination against an "otherwise qualified individual with a disability ...

solely by reason of her or his disability...." Id.  The same standard that is

applicable to claims under the ADA, however, applies to claims under the

Rehabilitation Act.   Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261,

1265 n.9 (4th Cir. 1995); 42 U.S.C. § 12133 (incorporating "remedies,

procedures, and rights" of Rehabilitation Act into Title II of the ADA).  Thus,

to make out a prima facie case of disability discrimination under the

Rehabilitation Act, the Plaintiff must show: (1) that she is an "individual with

a disability" within the meaning of the Act; (2) that she is qualified for her

job; and (3) that she "was excluded from the employment or benefit due to

discrimination solely on the basis of the disability."  Doe, 50 F.3d at 1264-

65.  The Rehabilitation Act defines an "individual with a disability" as a

person who: "(i) has a physical or mental impairment which substantially

limits one or more of such person's major life activities"; "(ii) has a record of

such an impairment"; or "(iii) is regarded as having such an impairment."

29 U.S.C. §705(20)(B).  A "major life activity" is defined as including such

functions as "caring for one's self, performing manual tasks, walking,

seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R.

§1615.103(2).  An impairment "substantially limits" a major life activity if it significantly restricts the individual's ability to perform either a "class of jobs" or a "broad range of jobs in various classes."  29 C.F.R. §1630.2(j)(3)(I).

In the present case, the Plaintiff has not presented a forecast of evidence that shows that her migraine headaches substantially limited a major life activity.  Moreover, the mere fact that the Plaintiff may have suffered migraine headaches as a result of alleged treatment by her supervisor, or that she may have been denied sick leave for going home with a migraine, does not constitute proof of either a disability or discrimination under the Rehabilitation Act.  Similarly, the fact that the Plaintiff has a 10% disability rating connected with her prior military service due to her migraine headaches does not automatically establish a disability under the Rehabilitation Act.  "The fact that an individual has a record of being a disabled veteran, or of disability retirement, or is classified as disabled for other purposes does not guarantee that the individual will satisfy the definition of 'disability' under part 1630."  Interpretative Guidance on Title I of the Americans with Disabilities Act ("ADA"), Appx. to 29 C.F.R. §1630.2(k); see also Bailey v. Charlotte-Mecklenburg Bd. of

Educ., No. 3:95CV565-MU, 2001 WL 1019736, at *1 (W.D.N.C. Apr. 3, 2001) (holding 20% knee disability rating does not constitute a "record of impairment" under the ADA).

The Plaintiff has not presented a forecast of evidence to demonstrate that she is substantially limited in her ability to perform either a "class of jobs" or a "broad range of jobs in various classes" as a result of any alleged impairment. Nor has the Plaintiff presented a forecast of evidence that she has a "record of ... an impairment" or that she was "regarded as having such an impairment" by her employer. Because the Plaintiff has failed to establish that she is an "individual with a disability," her claims for disability discrimination under the Rehabilitation Act must be dismissed.

## B.    Race Discrimination Claims

The Plaintiff, who is African-American, alleges that she was discriminated against based upon her race with respect to the following employment decisions: (1) an alleged demotion arising from her two-day and fourteen-day suspensions; (2) an undesirable reassignment, work assignments, and a significant change in employment status; (3) a hostile working environment, consisting of a pattern of continuous harassment, general harassment, threats and intimidation; and (4) an unjustified

negative evaluation. [Doc. 12 at 3-4; Doc. 23 at 26]. The Court will address each of the Plaintiff's claims in turn.

### 1. Demotion (Suspensions Without Pay)

In the Amended Complaint, which is on a standard complaint form provided by the Clerk's Office, the Plaintiff placed a check mark next to "Demotion" and added "2 and 14 days [sic] suspension w/o pay" to describe some of the discriminatory acts which form the basis of her suit. [Doc. 12 at 3]. A review of the record reveals, however, that the Plaintiff was never demoted. Viewing the Plaintiff's Amended Complaint liberally, the Court construes this claim of discrimination to be based upon the two suspensions without pay that the Plaintiff received during her employment.

The Plaintiff has not come forward with any direct or circumstantial evidence suggesting that her suspensions were motivated by an impermissible factor such as race. Accordingly, the Court will analyze her claim under the McDonnell Douglas pretext framework. To demonstrate a prima facie case of race discrimination, the Plaintiff must show: "(1) that [she] engaged in prohibited conduct similar to that of a person [outside the protected class], and (2) that disciplinary measures enforced against [her] were more severe than those enforced against the other person." Lightner

v. City of Wilmington, 545 F.3d 260, 264 (4th Cir. 2008) (quoting Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985)).

The Plaintiff received a two-day suspension without pay effective April 22, 2004, due to her absences without leave on February 18, 19, and 20, 2004, and her actions in abruptly opening a door to a co-worker's office and disrupting a telephone conversation with an attorney and challenging her supervisor with regard to work assignments.  [Gottlieb Aff., Doc. 41-3 at ¶8, Ex. 2-D].  The Plaintiff admitted that she put the wrong dates on her leave slip and that it was not signed before she left, and she further admitted that she threw open her co-worker's door and interrupted her phone conversation.  [Doc. 41-8 at 7-8].  Melville imposed a fourteen-day suspension on the Plaintiff effective July 11, 2004 for speaking disrespectfully to Ferguson, for yelling at Gottlieb when he tried to calm her down, and going into her office and calling 911, which resulted in police officers coming to the building and the issuance of an alarm in the building that created a disruption for several employees.  [Gottlieb Aff., Doc. 41-3 at ¶13; Melville Aff., Doc. 41-6 at ¶9].  Prior to imposing this suspension, Melville met with the Plaintiff for nearly two hours and considered a written response prepared by the Plaintiff.  Thereafter, Melville concluded that the

Plaintiff did not understand that what she had said and done during this incident was wrong, and she found Plaintiff's demeanor to be very confrontational. Further, she found Plaintiff's version of one incident to be exactly as it was reported by Ferguson in terms of the Plaintiff's tone and anger in her way of speaking. [Melville Aff., Doc. 41-6 at ¶7]. For her part, the Plaintiff does not deny calling 911 or creating a disruption. Rather, she claims that Gottlieb was equally at fault for causing her to be so upset when he attempted to speak with her without having a building security officer present. [Plaintiff's Affidavit, Doc. 41-10 at 15].

The Plaintiff has not presented a prima facie case of discrimination arising from either of these suspensions. Specifically, the Plaintiff has failed to present a forecast of evidence to show that any other employees outside of the protected class engaged in similar misconduct and that she was disciplined more severely than these other employees. The Plaintiff having failed to present a prima facie case, her race discrimination claim must be dismissed.

Even if the Plaintiff had established a prima facie case, the Defendant has presented evidence of legitimate, non-discriminatory reasons for these suspensions, and the Plaintiff has failed to present a

forecast of evidence to show that these proffered reasons are in any way pretextual. As such, the Plaintiff has failed to state a claim for race discrimination under Title VII arising from these suspensions, and thus, her claim must be dismissed.

## 2. Reassignment

The Plaintiff claims that she was unlawfully discriminated against when she was reassigned to perform some of the mail processing duties that had previously been performed by another employee. The Plaintiff, however, offers no evidence that this reassignment adversely affected the terms and conditions of her employment. Nor has she offered any evidence that this reassignment was based upon her protected status. In contrast, the Defendant has presented a forecast of evidence to show that there were legitimate, non-discriminatory reasons for this reassignment. The forecast of evidence presented by the Defendant, which the Plaintiff offers nothing to refute, demonstrates that when Chambers left, the agency was under a hiring freeze and could not hire a replacement. As a result, mail processing duties were reassigned among several employees, including Caucasian employees and employees of whom there was no evidence of any knowledge regarding any prior EEO activity, who

performed such duties in addition to their regular duties. [Ferguson Aff., Doc. 41-2 at ¶9]. While Gottlieb made repeated requests for the hiring freeze to be lifted, his requests were not granted until after the Plaintiff was terminated. [Gottlieb Aff., Doc. 41-3 at ¶¶20-22].

In April 2004, Gottlieb decided that an employee needed to be physically in the mail room on a temporary basis to handle duties that were best performed in that area. He chose the Plaintiff because her status verification duties had been transferred to the NRC, and because the Plaintiff had expressed a desire to move her office. Other employees continued to assist with mail processing duties. [Gottlieb Aff., Doc. 41-3 at ¶18]. The Plaintiff moved to the mail room on April 30, 2004. Ferguson observed that the Plaintiff appeared happy to be moving out of her old office. [Ferguson Aff., Doc. 41-2 at ¶12].

The forecast of evidence presented by the Defendant further shows that it was not until early 2005, after the Plaintiff was terminated, that Gottlieb's request for additional staff was granted and the Charlotte office was authorized to hire additional employees. Gottlieb hired two persons, one who is Caucasian and one who is African-American, for the Status Verifier positions. Neither employee performed status verification duties at

the time they were hired because those duties were still being handled remotely.  Rather, both employees performed the mail processing duties previously performed by the Plaintiff.  While one of these employees eventually did perform status verification duties for a few months, by September 2007, all status verification duties were reassigned to a central office.

These undisputed facts make clear that the Plaintiff's regular status verification duties were transferred to another office, thus making it easier for her to assume more of the mail processing duties.  There is no evidence that the Plaintiff's pay or work conditions were adversely affected by the reassignment of her status verification duties.  More importantly, there is no evidence that the reassignment of Plaintiff's status verification duties was based on unlawful discrimination or that the Defendant's stated reasons for the reassignment were a pretext for unlawful discrimination.  As such, Plaintiff's discrimination claim based upon her work assignment must fail.

### 3.    Hostile Work Environment

In order to sustain a claim for a hostile work environment, the Plaintiff must demonstrate: (1) that she was subjected to unwelcome harassment;

(2) that the harassment was because of her protected status; (3) that the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere"; and (4) that the harassing conduct is imputable to the employer.  EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 313 (4th Cir. 2008).  In establishing the "severe or pervasive" nature of the work environment, the Plaintiff must show not only that she "subjectively perceived the work environment to be abusive," but also that "a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive."  Id. at 315 (internal quotation marks and citations omitted).

In asserting that she was subjected to a hostile work environment, the Plaintiff claims that her time and attendance were unduly scrutinized. The Plaintiff, however, offers no specifics as to when this occurred or how often, nor does she offer any proof that any one else did not have their time and attendance scrutinized.  She further states her leave requests were denied, but she fails to identify when this occurred except for the one incident in February 2004 when she was absent from work on dates different from when she had requested leave, and thus she was found to be absent without leave.

The Plaintiff claims she was assigned extra duties for which she received no compensation or recognition, yet she does not produce evidence of any specifics, nor does she claim that her salary was reduced in any way, apart from her periods of suspension. She further complains she did not receive special recognition for her work performed during the office move, whereas four Caucasian employees did receive special recognition. The fact that the Plaintiff did not receive special recognition for performing her job duties, however, can hardly be said to create a hostile or abusive working atmosphere.

The Plaintiff states she was the only employee with a windowless office, but does not identify the position, pay grade or status of those employees who had offices with windows. In fact, the Plaintiff was the only Grade GS-7 employee with a separate office; all other employees of that grade were in cubicles. [Ferguson Aff., Doc. 41-2 at ¶6]. While the Plaintiff complains that she was told to keep her office door and blinds open, it is undisputed that CIS office policy required all non-management staff to keep their doors and blinds open unless interviews were being conducted or other CIS work was being performed that required privacy. [Gottlieb Aff., Doc. 41-3 at ¶24].

The Plaintiff alleges that she received a low performance appraisal on May 18, 2004 from Ms. Ferguson. Yet, the undisputed evidence establishes that this appraisal was initially issued in error and then reissued *without* the low rating. [Ferguson Aff., Doc. 41-2 at ¶¶14-15; Plaintiff's Aff., Doc. 41-10 at 17].

The Plaintiff further alleges that three Caucasian employees who should have been disciplined were not, [Plaintiff's Aff., Doc. 41-10 at 4], but offers no evidence and only speculation with respect to those employees. Id. "[C]onclusory statements without specific evidentiary support, cannot support an actionable claim for harassment." Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998). Moreover, the Defendant has presented a forecast of evidence to show that, to the extent that any of these employees engaged in wrongdoing, they did not receive any preferential treatment due to their race. Specifically, Melville testified that Vivian Stergiou was terminated for her criminal misconduct in April 2003. [Melville Aff., Doc. 41-6 at ¶11]. With respect to Cathy Zalenski, the Plaintiff offers no evidence that management was aware of her alleged conduct. For his part, Gottlieb testified that it had never been reported to management that Zalenski was involved in any conduct that could be considered unethical or

a conflict of interest. [Gottlieb Aff., Doc. 41-3 at ¶27]. Although the Plaintiff alleges that Marla Miller falsely accused another employee of assaulting her, the Plaintiff does not offer any evidence as to why this accusation was false.

The Plaintiff states, without specifics, that other Caucasian employees had verbal confrontations with Ferguson but that none had ever been disciplined for such conduct. [Plaintiff's Aff., Doc. 41-10 at 3]. For her part, Ferguson has stated in an affidavit that while she has had disagreements with other employees, she has never felt intimidated by anyone else, she has never had another employee refuse to follow her directions as did the Plaintiff, and that no other employee used profanity or threatening language toward her as did the Plaintiff. [Ferguson Aff., Doc. 4-1-2 at ¶17].

Viewing the evidence in the light most favorable to the Plaintiff, the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that the Plaintiff was subjected to a "severe or pervasive" hostile work environment. As the Fourth Circuit has stated, "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded

feelings will not on that account satisfy the severe or pervasive standard."

Sunbelt Rentals, 521 F.3d at 315.  Further, the Plaintiff has failed to

present a forecast of evidence from which a reasonable jury could

conclude that the Plaintiff was subjected to a hostile or abusive

atmosphere *because of* her race or any type of protected status.

Accordingly, the Plaintiff's hostile work environment claim must be

dismissed.

### C.    Retaliation

Finally, the Plaintiff alleges that the Defendant discriminated against

her for filing an EEO complaint.  [Doc. 12 at 3-5 and Doc. 12-2 at 3-4].  In

order to state a prima facie case of retaliation, the Plaintiff must show: "(1)

that she engaged in a protected activity; (2) that her employer took an

adverse employment action against her; and (3) that there was a causal

link between the two events."  EEOC v. Navy Fed. Credit Union, 424 F.3d

397, 405-06 (4th Cir. 2005).  Once a prima facie case has been shown, the

burden shifts to the defendant to rebut the presumption of retaliation by

articulating a legitimate non-discriminatory reason for the adverse

employment action. Id. at 405.  "If the defendant carries this burden, the

onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext." Id.

Even assuming that the Plaintiff had been able to make out a prima facie case of retaliation, for the same reasons as stated above the Defendant has set forth legitimate non-discriminatory reasons for the employment actions taken against the Plaintiff, and the Plaintiff has failed to come forward with a forecast of evidence to show that these reasons proffered by the Defendant are pretext for unlawful retaliation. Accordingly, for the reasons stated above, the Plaintiff's retaliation claim also must be dismissed.

## V. MOTION TO STRIKE

The Plaintiff moves to strike the paragraph entitled "Argument" at page 22 of her Motion for Summary Judgment. [Doc. 44]. The Defendant does not oppose the Plaintiff's motion to strike a portion of her own pleading. [Doc. 48]. Accordingly, the Plaintiff's motion will be allowed.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion to Strike "Argument[s]" from Plaintiff's Motion for Summary Judgment [Doc. 44] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 39] is **GRANTED**; the Plaintiff's Motion for Summary Judgment [Doc. 38] is **DENIED**; and this case is **DISMISSED**. Judgment shall issue simultaneously herewith.

**IT IS SO ORDERED.**

Signed: December 8, 2008

Martin Reidinger
United States District Judge